**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

CALVIN DUGAN,

          Plaintiff,

v.

BLUESCOPE BUILDINGS NORTH AMERICA, INC., et al.,

          Defendant.

Case No. 1:24-cv-01560 JLT EPG

ORDER DENYING MOTION TO REMAND

(Doc. 8)

Calvin Dugan alleges Bluescope Buildings North America, Inc., his former employer, did not pay him and other similarly situated employees all of the wages they were due, among other similar claims. Bluescope removed the case to this court based on its allegation that the Court has jurisdiction under the Class Action Fairness Act. Dugan moves to remand the case to state court. He argues the removal is based on unreasonable assumptions and a faulty analysis of the company's employee records. Although Bluescope likely overstated the amount in controversy, it has nevertheless proven at this stage that this court has jurisdiction. The motion to remand is **DENIED**.

## BACKGROUND

Dugan worked as an hourly, non-exempt employee for Bluescope in Tulare County, California, in 2023 and 2024. (Doc. 1-1 ¶ 7, 13.) He alleges the company typically scheduled

1

him to work at least five days per week and more than eight hours per day, but did not pay him for all of his time on the job. (*Id.* ¶ 13.)  He also alleges the company did not give him uninterrupted meal breaks and rest breaks, did not reimburse his business expenses, did not pay him the wages he was due when he left the company, and did not give him accurate wage statements, all in violation of the California Labor Code and Business and Professions Code. (*Id.* ¶ 14)  Dugan describes his experience at Bluescope as "typical and illustrative" of his former coworkers' experiences (*id.*), and he proposes a class action by the company's similarly situated current and former employees (*id.* ¶¶ 21–29).

Dugan originally filed this case in state court. (*See id.* at 2.)  Bluescope removed the case to this court under 28 U.S.C. § 1332(d), which includes the jurisdictional provisions of the Class Action Fairness Act. (*See* Doc. 1 at 3–8).  Bluescope alleged, as § 1332(d) requires, that there were more than one hundred people in the proposed class, that Dugan is a citizen of a different state (California) than the company (Delaware and Missouri), and that his allegations put more than $5 million in controversy. (*See id.*)  Dugan did not make specific claims about the damages and other remedies he was seeking on behalf of the proposed class, so the company relied on its own records and a few assumptions to estimate how much Dugan is attempting to recover on behalf of the proposed class. (*See id.*)

Dugan moves to remand the case to state court. (Doc. 8.)  He does not dispute that the proposed class would include more than one hundred people, nor that he is a citizen of a different state than Bluescope.  He argues Bluescope relied on arbitrary and unreasonable assumptions to allege that his complaint puts more than $5 million on in controversy. (*See id.* at 11–25.)  The company opposes the motion (Doc. 11), and Dugan replied (Doc. 12).  The Court took the matter under submission without holding a hearing. (Doc. 10.)

## STANDARD OF DECISION

Federal law allows a defendant to remove a case from a state court to the appropriate federal district court if the federal court would originally have had jurisdiction.  28 U.S.C. § 1441(a).  To accomplish the removal, the defendant must file a notice in the federal district court, which must contain among other things "a short and plain statement of the grounds for

removal." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 83 (2014) (quoting 28 U.S.C. § 1446(a)).  It is not necessary for the defendant to submit evidence with this notice. Plausible allegations suffice.  *See Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019)).

If the plaintiff later contests the defendant's allegations about the amount in controversy, as Dugan does in this case, then that defendant must prove "by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million," i.e., that the amount in controversy is more likely to exceed the $5 million threshold than fall short of it.  *Ibarra v. Manheim Investment, Inc.*, 774 F.3d 1193, 1197 (9th Cir. 2015)).  The defendant can, for example, offer declarations, exhibits, and other "summary-judgment-type evidence."  *Id.*  A defendant can also rely on reasonable assumptions, including those based on the plaintiff's own allegations.  *Harris v. KM Indus., Inc.*, 980 F.3d 694, 701 (9th Cir. 2020); *Arias*, 936 F.3d at 926–27.  It may not rely on speculation or conjecture, however, nor assumptions "pulled from thin air."  *Ibarra*, 775 F.3d at 1197.  An assumption must have "some reasonable ground" beneath it.  *Id.*  Plaintiffs may respond by submitting their own evidence in reply, or by arguing the defendants' assumptions are not unreasonable.  *See Harris*, 980 F.3d at 699.  The court then weighs the evidence, considers whether the defendant's assumptions are reasonable, and decides whether the amount in controversy is more likely to exceed the jurisdictional threshold than fall short of it.  *See id.* at 701.

The question the court must answer is not whether the plaintiff will probably recover any particular amount of money or secure some particular injunction.  *See Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018).  Courts cannot demand that a defendant predict the "eventual award with one hundred percent accuracy."  *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 993 (9th Cir. 2022) (quoting *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004)).  Nor is the goal to reach some "prospective assessment of the defendant's liability."  *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 401 (9th Cir. 2010).  The amount is controversy "is simply an estimate of the total amount in dispute."  *Id.*  If the defendant shows that value is more likely greater than $5 million, it has carried its burden.  *See id.*

In wage and hour cases like this one, these standards have prompted sharp disputes about what a defendant can infer from a plaintiff's allegations.  This case is no exception.  It is relatively rare in practice for a complaint to include the sort of specifics that might permit straightforward calculations of the amount in controversy, such as allegations about how many hours the defendant's employees worked on average, how much they earned per hour, how frequently or how long they normally worked without pay, or how often they were interrupted during their breaks.  *See Toribio v. ITT Aerospace Controls LLC*, No. 19-5430, 2019 WL 4254935, at *2 (C.D. Cal. Sept. 5, 2019).  Complaints more commonly employ vaguer, qualitative descriptions that have come to be known as "limiting language."  *E.g.*, *Banuelos v. Dominos Pizza LLC*, No. 24-07085, 2025 WL 786350, at *4 (N.D. Cal. Mar. 12, 2025); *Demaria v. Big Lots Stores - PNS, LLC*, No. 23-00296, 2023 WL 6390151, at *6 (E.D. Cal. Sept. 29, 2023).  A plaintiff might allege, for example, that the defendant "routinely" failed to pay its employees all wages due, *Arias*, 936 F.3d at 926; that there were "periodic shortages" in their compensation, *Rapisura v. BMW of N. Am., LLC*, No. 22-00455, 2022 WL 1557001, at *2 (E.D. Cal. May 17, 2022); that the alleged violations occurred "at times" and "on occasion," *Cabrera v. S. Valley Almond Co., LLC*, No. 21-00748, 2021 WL 5937585, at *8 (E.D. Cal. Dec. 16, 2021); or that a defendant had a "policy and practice" of interrupting its employees' lunch breaks, *Lopez v. Bio-Reference Lab'ys, Inc.*, No. 21-02063, 2022 WL 1744993, at *2 (E.D. Cal. May 31, 2022).

Defendants can and do often argue that this type of limiting language makes it reasonable to assume the plaintiff will attempt to prove that violations occurred with some specific minimum frequency.  *See, e.g.*, *Arias*, 936 F.3d at 926.  Courts have been willing to accept these types of estimates in many cases, at least in the absence of contrary evidence or conflicting allegations within the complaint.  *See, e.g.*, *Perez*, 131 F.4th at 809–10; *Lopez*, 2022 WL 1744993, at *2.  Decisions along these lines have accumulated into something resembling a loose common law rule of adverbs, such that a defendant can cite opinions and orders in which courts have found it reasonable to assume from a plaintiff's allegations about violations, say, "at times" or "on occasion" that the alleged violations occurred approximately once a week or more.  *See, e.g.*, *Perez*, 131 F.4th at 809–10; *see also Demaria*, 2023 WL 6390151, at *6; *Cabrera*, 2021 WL

4

5917585, at *6.

In the past, district courts have sometimes expressed skepticism about this type of logic. As some have pointed out, it has generated a variety of nominally "reasonable" but practically conflicting interpretations of the same limiting phrases, such that plaintiffs and defendants alike can find authority to support their respective positions. *See, e.g.*, *Toribio*, 2019 WL 4254935, at *3 (collecting authority). Dugan and Bluescope have done so in this case. (*Compare, e.g.*, Doc. 8 at 15–16 *with, e.g.*, Doc. 11 at 8–9). Given the variety of assumptions that might be "reasonable" interpretations of phrases like "at times" or "on occasion," almost any choice can also seem somewhat arbitrary. *See, e.g.*, *Vanegas v. DHL Express (USA), Inc.*, No. 21-01538, 2021 WL 1139743, at *3 (C.D. Cal. Mar. 24, 2021). The exercise can indeed sometimes seem like a walk through a "mathematical fantasyland." *Aguirre v. BW Packaging Sys., Inc.*, No. 22-4980, 2023 WL 2605016, at *3 (C.D. Cal. Mar. 22, 2023) (quoting *Toribio*, 2019 WL 4254935, at *3). But as this Court recently decided, the Ninth Circuit expressly permits defendants to rely on assumptions about "vague terms" that "may be susceptible to a flexible, broad range of interpretations." *Soto v. Graybar Elec. Co., Inc.*, No. 24-00520, 2025 WL 3648360, at *4 (E.D. Cal. Dec. 16, 2025) (citing *Perez*, 131 F.4th at 810). And there is a solution. Plaintiffs who wish to constrain an opposing party's estimates of the amount in controversy can use more specific limiting language in their complaints. *See Perez*, 131 F.4th at 810.

**DISCUSSION**

Bluescope relies on five categories of potential remedies to show that Dugan's complaint puts more than $5 million in controversy: (1) compensation for unpaid wages, (2) penalties for missed meal breaks and rest breaks, (3) penalties for late wages following a termination, (4) penalties for inaccurate wage statements, and (5) attorneys' fees. (Doc. 11 at 18.)

**I.     Unpaid Wages (Claims One and Two)**

Dugan alleges Bluescope did not pay its employees at least minimum wages for all of the hours they worked, in violation of the California Labor Code. (Doc. 1-1 ¶¶ 30–39.) He alleges similarly that the company did not pay an overtime premium when employees worked more than eight hours in a given day. (*Id.* ¶¶ 40–48.) He does not allege how often this occurred or how

5

much time went uncompensated, but he attributes the failure to a "policy and practice" that occurred "systematically" and throughout the class period, i.e., "[a]t all relevant times."  (*Id.* ¶¶ 15, 32, 38.)

Bluescope checked its records and found that its employees had usually worked eight hours per day over the relevant time, sometimes longer, sometimes shorter.  (Doc. 11-1 ¶ 3.)  But on an annual basis, the company's records showed that its employees had consistently worked a few minutes more than eight hours per day on average.  (*See id.* ¶¶ 4–8.)  There was one exception: for the year between January and December 2023, its employees worked about seven hours and fifty minutes per day on average.  (*See id.* ¶ 7.)

Bluescope assumed based on these records and Dugan's allegations that class members would seek one hour of unpaid time at the average regular rate for each week they worked.  (*See* Doc. 11 at 8–11).  As Dugan points out, this was not a reasonable assumption.  (*See* Doc. 12 at 2–4.)  If the company's records show that in three out of the four relevant years, employees worked more than eight hours per day on average, then it would not be reasonable for the company to assume that they worked for another hour at their regular, non-overtime rate every week without pay.  After all, the company's records showed that it had actually paid its employees for more than eight hours of work on average.  At most, it would be reasonable to assume that employees might not have been paid for some time in 2023, when average shifts were about ten minutes shorter than eight hours.  For that year, it would be reasonable to assume employees would seek unpaid wages for that ten-minute gap at most, i.e., ten minutes per day, about $90,000 in total.[1] No more could be at stake, at least on the record the company has presented at this stage.

For the second claim, which focuses on unpaid overtime wages, the company's logic is sounder.  It would be reasonable to assume that employees worked for a few minutes more than eight hours a day on average for all four of the years in question, if not more.  Ten to fifteen minutes per day of unpaid overtime is a reasonable assumption to make, given Dugan's

---

[1]  Ten minutes per workday is one sixth of an hour per workday.  Over the course of a workweek, this would amount to five sixths of an hour in unpaid time.  Five sixths of an hour per workweek × 6,972 total employee workweeks in 2023 × $15.50 per hour in average wages for 2023 is $90,055 in total.  (*See* Doc. 11 at 6.)

allegations that the company had a systematic policy or practice not to pay overtime wages for the short tasks he identifies, such as waiting in line to clock in or out. (*See* Doc. 1-1 ¶ 15.) Dugan does not contend otherwise. Bluescope therefore reasonably estimated that Dugan's second claim puts about $980,000 in controversy. (*See* Doc. 11 at 7.) In total, then, it is reasonable to assume that about $1.1 million is at stake for claims one and two.

## II.    Meal and Rest Breaks (Claims Three and Four)

In claim three, Dugan alleges Bluescope "regularly failed to provide [him] and the Class" with duty-free breaks for meals in violation of the state Labor Code and Wage Orders. (Doc. 1-1 ¶¶ 50–51.) He alleges similarly in claim four that Bluescope "failed to authorize [him] and the Class to take rest breaks, regardless of whether [they] worked more than 4 hours in a workday," again in violation of the state Labor Code and Wage Orders. (*Id.* ¶¶ 54–55.) He alleges these failures were the result of a "policy and practice" and occurred "sometimes, but not always." (*Id.* ¶¶ 16–17.)

Bluescope assumed based on these allegations that Dugan would attempt to prove that the company's employees missed at least two meal breaks and two rest breaks per week on average. (Doc. 11 at 12.) The company then checked its own records to confirm how many employees it had for each calendar year between November 2020 and December 2024 (the proposed class period) and how many weeks each employee worked during each of these years. (*See* Doc. 11-1 ¶¶ 4–8.) For each year, the company then multiplied the number of workweeks by four (two missed meal breaks and two missed rest breaks) to estimate the total number of potential violations per year. (*See* Doc. 11 at 13–14.) It assumed that if Dugan prevailed, each employee would be entitled to an hour of pay for each of these violations. (*See id.*) As a stand-in for that hourly rate, the company used the average hourly rate for the year in question. (*See id.*) The final result of this calculation is an estimate that, together, Dugan's meal and rest break claims put approximately $2.6 million in controversy. (*Id.* at 14.)

Dugan argues it was unreasonable for Bluescope to interpret his complaint as alleging that employees missed their meal and rest breaks about 40% of the time, i.e., on almost half of all the days they worked. (Doc. 12 at 5–7.) He contends that it would be more reasonable to assume

that employees missed about one meal break and one rest break per week on average, at most. (*See id.*)  He relies on cases in which California district courts have held that limiting language like "at times" and "on occasion" implies violations occurred about once per week.  (*See id.*).

The court agrees with his interpretation of the available persuasive authority, at least when it comes to the specific phrases "at times" and "on occasion."  *See, e.g.*, *Carroll v. Ameri-Force Craft Servs., Inc.*, No. 24-1443, 2025 WL 2621704, at *5 (S.D. Cal. Sept. 11, 2025); *Bonetti v. TriStruX LLC*, No. 24-01319, 2024 WL 3225905, at *7 (N.D. Cal. June 27, 2024).  But Dugan does not allege that Bluescope interrupted its employees' breaks only "at times," or "on occasion."  He alleges it happened "sometimes, but not always" and was part of a "policy and practice."  (Doc. 1-1 ¶¶ 16–17.)  These phrases could quite reasonably imply that violations were more frequent than just once per week on average.

In other cases, courts have reached conflicting conclusions about the phrase "sometimes, but not always."  *Compare, e.g.*, *Correa v. Evoqua Water Techs., LLC*, No. 25-03956, 2026 WL 216317, at *5–6 (C.D. Cal. Jan. 26, 2026) (reviewing cases and finding it would be reasonable to assume that violations occurred about 20–30% of the time, given the allegation that breaks were interrupted "sometimes, but not always"), *with, e.g.*, *Sauls v. Computershare Inc.*, No. 24-03164, 2025 WL 2788047, at *5 (E.D. Cal. Oct. 1, 2025) ("[C]ourts have deemed a 60% violation rate to be a reasonable assumption when the plaintiff alleges that the defendant 'sometimes, but not always,' violated meal break protections.").  It is not necessary to decide which line of authority is more persuasive.  The disagreement itself is enough to confirm that it was reasonable for Bluescope to assume that its employees will attempt to prove they were deprived of about two uninterrupted meal breaks and two uninterrupted rest breaks per week, on average.  It is therefore reasonable to conclude that claims three and four put approximately $2.6 million in controversy, if not more.

### III.    Wages Due at Termination (Claim Six)

In claim six, Dugan alleges Bluescope did not pay him and other employees all wages due within 72 hours after their last day on the job, again in violation of the state Labor Code.  (Doc. 1-1 ¶¶ 61–67.)  Bluescope found in its records that 165 people had left the company between

8

November 2020 and November 2024.  (Doc. 11-1 ¶ 10.)  The average hourly rate for that period was more than $24.  (*See id.* ¶¶ 4–8.)  The company assumed that Dugan was seeking the maximum thirty-day penalty available under the law, given his allegations that the company had failed to pay both minimum wages and overtime premiums over the course of the proposed class period.  (*See* Doc. 11 at 14–15.)  The estimate of the amount in controversy was then once more a relatively simple multiplication problem: under the company's interpretation of Dugan's allegations, each terminated employee would be entitled to a penalty for thirty eight hour days, compensated at the average hourly rate, in total about $971,000.  (*See id.* at 15.)

Dugan points out that his sixth claim is subject to a three-year limitations period, not a four-year limitations period.  (*See* Doc. 12 at 8.)  The Court agrees.  *See Pineda v. Bank of Am.*, *N.A.*, 50 Cal. 4th 1389, 1398 (2010) ("[S]ection 203(b) [of the state Labor Code] contains a single, three-year limitations period governing all actions for section 203 penalties irrespective of whether an employee's claim for penalties is accompanied by a claim for unpaid final wages.").  Bluescope's calculation overestimates the amount in controversy for claim six by assuming four years are in play.

Dugan argues that because Bluescope has not offered any evidence to show how many people left the company during the applicable three-year limitations period, it has "failed to meet its burden" to show that any amount is in controversy at all.  (Doc. 12 at 9 (quoting *Jauregui*, 28 F.4th at 996).)  In the case Dugan cites, the Ninth Circuit held that the district court had erred by assigning no value to the claim in question after it found that this claim was based on an unreasonable assumption.  *See* 28 F.4th at 995.  The solution was not to zero out the claim's value, but rather to correct the unreasonable assumption.  *See id.* at 996 ("[O]ften, as illustrated here, the reason a defendant's assumption is rejected is because a different, better assumption is identified.  Where that's the case, the district court should consider the claim under the better assumption—not just zero-out the claim.").  A proportional decrease is an appropriate correction here, given the roughly similar number of employees who worked at the company in each calendar year between 2020 and 2024.  (*See* Doc. 11-1 ¶¶ 4–8.)  It is thus reasonable to conclude

that claim six puts approximately $725,000 in controversy.[2]

### IV.    Inaccurate Wage Statements (Claim Seven)

In claim seven, Dugan alleges the company sent inaccurate wage statements to him and other class members in violation of the Labor Code. (*See* Doc. 1-1 ¶¶ 68–75.) The parties appear to agree that this claim is derivative of Dugan's other claims. (*See* Docs. 1-1 ¶ 70; 11 at 16–17; 12 at 9.) The company assumed Dugan would attempt to prove that every wage statement fell short in one way or another, given his allegations about missed meal and rest breaks and wages that went unpaid throughout the proposed class period. (*See* Doc. 11 at 12.) Dugan argues this assumption was not reasonable, but he does not explain why, nor what estimate might be more reasonable. (*See* Doc. 12 at 9.) And as Bluescope points out, district courts have accepted similar assumptions in similar cases. *See, e.g.*, *Serrieh v. Jill Acquisition LLC*, 707 F. Supp. 3d 968, 978 (E.D. Cal. 2023). The Court agrees: when a plaintiff alleges longstanding policies or practices resulted in unpaid wages and missed breaks over a period of many years, and when it is reasonable to assume that these violations occurred on a weekly basis, it is also reasonable to assume that almost every wage statement was at least partially inaccurate.

Bluescope estimated the amount in controversy by assuming each employee would seek an initial penalty of $50, plus a $100 penalty for each wage statement that followed. (Doc. 11 at 16–17.) This calculation resulted in a reasonable estimate that claim seven puts about $379,000 in controversy.

### V.    Attorneys' Fees

Bluescope has demonstrated to this point that approximately $4.8 million is in controversy,[3] just 4% shy of the jurisdictional threshold. The company argues Dugan's request for an award of reasonable attorneys' fees puts much more than that 4% difference into controversy. It proposes an additional 25% of the total potential damages award as an estimation of the attorneys' fees that are likely at issue. (*See* Doc. 11 at 17–18.)

---

[2] Three-quarters of Bluescope's four-year estimate ($971,388) is $728,541.

[3] $90,055 (claim one) + $982,844.32 (claim two) + $1,310,505.20 (claim three) + $1,310,505.20 (claim four) + $728,541 (claim six) + $378,800.00 (claim seven) = $4,801,250.72.

As is true in most similar cases, "at least some of the California wage and hour laws that form the basis of the complaint entitle a prevailing plaintiff to an award of attorneys' fees." *Arias*, 936 F.3d at 928.  A 25% fee like the one Bluescope assumed might be a reasonable estimate in some situations, but the Ninth Circuit has expressly "declined to adopt a per se rule that 'the amount of attorneys' fees in controversy in class actions is 25 percent of all other alleged recovery.'" *Id.* (quoting *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785, 796 (9th Cir. 2018)).  A lower or higher sum may be reasonable, or it may not be necessary to calculate an exact figure, given the other claims the plaintiff asserts.  *See id.* at 928 n.5.

That is true here.  It is not necessary to decide whether the company's 25% estimate accurately reflects the reality of this case as Dugan has framed it.  Even a much smaller award would put more than $5 million in controversy.  It is reasonable to assume in a case like this one that successful attorneys will be awarded fees representing at least five percent of the total recovery.  Successful plaintiffs have consistently received much larger awards.  *See, e.g.*, *Sauls*, 2025 WL 3788047, at *11; *Serrieh*, 707 F. Supp. 3d at 980; *Demaria*, 2023 WL 6390151, at *7.

## CONCLUSION

The Court has jurisdiction.  The motion to remand (Doc. 8) is **DENIED**.

IT IS SO ORDERED.

Dated:   **February 20, 2026**

UNITED STATES DISTRICT JUDGE

11